IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SHARKEYE, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 1:12-CV-558 |
| | § | |
| CASE-MATE, INC., CASE-MATE | § | |
| IRELAND HOLDINGS LIMITED, AND | § | JURY DEMANDED |
| CASE-MATE IRELAND LIMITED, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF SHARKEYE, LLC'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff SharkEye, LLC ("SharkEye") brings this action for breach of contract, promissory estoppel, and fraudulent inducement against Defendants Case-Mate, Inc., Case-Mate Ireland Holdings Limited, and Case-Mate Ireland Limited (collectively, "Defendants") and alleges as follows:

### The Parties

1.  Plaintiff SharkEye is a limited liability company organized under the laws of the State of Texas with its principal office located at 8027 Exchange Drive, Austin, Texas 78754.

2.  Defendant Case-Mate, Inc. ("Case-Mate") is a corporation organized under the laws of the State of Georgia with its principal office located at 2048 Weems Rd., Tucker, Georgia 30084. Upon information and belief, Case-Mate is a nonresident of Texas that engages in business in this state but does not maintain a regular place of business in the state or a designated agent for service of process in the state. Case-Mate may be served through its

registered agent on file with the State of Georgia, William M. Poole, 17th Street, Nw, Ste 1700, Atlanta, Georgia 30363.

3. Defendant Case-Mate Ireland Holdings Limited ("Case-MateIH") is a company organized under the laws of Ireland with its principal office located at Molyneux House, Bride Street, Dublin 8, Ireland.  Upon information and belief, Case-MateIH is a nonresident of Texas that engages in business in this state but does not maintain a regular place of business in the state or a designated agent for service of process in the state.  Case-MateIH may be served in Ireland pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

4. Defendant Case-Mate Ireland Limited ("Case-MateI") is a company organized under the laws of Ireland with its principal office located at the Anchorage, 17/19 Sir John Rogerson's Quay, Dublin 2, Ireland.  Upon information and belief, Case-MateI is a nonresident of Texas that engages in business in this state but does not maintain a regular place of business in the state or a designated agent for service of process in the state.  Case-MateI may be served in Ireland pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

## Jurisdiction and Venue

5. The Court has jurisdiction over this action under 28 U.S.C § 1332(a) because SharkEye is a citizen of Texas, Case-Mate is a citizen of Georgia, and Case-MateIH and Case-MateI are citizens of Ireland for the purposes of diversity jurisdiction, and the amount in controversy exceeds $75,000, excluding interest and costs.

6. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because a substantial part of the property that is the subject of this action is situated in this district.

7. Venue is also proper under 28 U.S.C. § 1391(b)(3) because personal jurisdiction exists generally over Defendants because they have sufficient contacts with the forum as a result of business conducted within the State of Texas and this district. Personal jurisdiction also exists over Defendants because of their conduct in selling, offering to sell, importing, or placing into the stream of commerce products into the State of Texas and this district. Personal jurisdiction also exists over Defendants because they entered into a contractual relationship with SharkEye in the State of Texas and this district.

## The Material Facts

8. SharkEye was founded by mechanical engineers with deep experience in designing and manufacturing ruggedized cases for military applications. After the iPhone became popular, SharkEye's founders noticed its screen frequently shattered when the phone was impacted, even if the phone was encased in a conventional case or bumper. Recognizing that no case on the market offered serious screen protection, they spent over two years designing and testing a case that features a revolutionary retractable screen protector and other internal features that absorb shock. The screen protector operates like a shade that slides over the screen when needed and then disappears into the case when retracted, much like the clear-membrane barriers that cover a shark's eyes when they attack their prey or become subject to impact.

9. SharkEye has filed a trademark covering its name and applied for a patent covering the retractable screen protector and other unique features of the case.

10. In May 2011, Shashi Reddy, Case-Mate's CEO, discovered the SharkEye case and contacted SharkEye.

11. Mr. Reddy represented to SharkEye that Case-Mate had the engineering, manufacturing, marketing, and sales experience, as well as the resources, to launch 30 different models of the SharkEye cases globally in 80 countries in the next 90 days.

12. Mr. Reddy assured SharkEye that Case-Mate could sell at least 1.5 million SharkEye cases in the first year and over 2.5 million cases in the second year, and that Case-Mate would "hit this out of the ball park."

13. Mr. Reddy was so excited by the design of the SharkEye case that only five days after their initial discussion, he invited its management team and principal investor to his offices to negotiate an exclusive relationship.

14. At the meetings that followed, Mr. Reddy stated that he "had to have" the SharkEye case and that Case-Mate would make a massive marketing push, take on all of the product and inventory risk associated with manufacturing, marketing, and selling SharkEye cases globally, and make the SharkEye cases Case-Mate's exclusive line of rugged cases in exchange for an exclusive license to SharkEye's intellectual property.

15. After significant negotiation and drafting, SharkEye and Defendants ultimately executed a ten-year Exclusive License Agreement dated June 23, 2011 (the "ELA").

16. In Section 3.1 of the ELA, SharkEye granted Defendants an exclusive, worldwide license "to manufacture, have manufactured, market, distribute, modify and sell" the SharkEye cases and a broader category of rugged mobile device cases "using the licensed confidential and proprietary know-how and technology, including but not limited to any cases embodying one or

more claims of" SharkEye's pending patent application and any improvements thereto (collectively, the "Licensed Products").

17. In Section 3.2(a) of the ELA, Defendants committed to sell a minimum 500,000 Licensed Products by December 23, 2012, and a minimum of 500,000 Licensed Products each twelve-month period thereafter during the ten-year term of the ELA.

18. In Section 3.2(b) of the ELA, Defendants committed to make the Licensed Products their exclusive line of rugged cases and to refrain from selling any other rugged cases that are "directly competitive with" or that "offer equivalent protection to" the Licensed Products.

19. In Section 3.2(c) of the ELA, Defendants committed to paying a 15 percent royalty on all revenue received from the sales of Licensed Products.

20. Pursuant to Section 4.3 of the ELA, the ELA may only be terminated if either party liquidates, or threatens to liquidate, its assets; has a receiver appointed or entered into any insolvency proceedings; or commits a material breach or an anticipatory breach.

21. Pursuant to Section 4.4 of the ELA, in the event that Defendants fail to sell the minimum amount of Licensed Products, Defendants may pay SharkEye "an amount equal to the difference between the actual royalties paid prior to the end of the applicable period and the average historical [revenue received from the sales of Licensed Products] per unit received to date multiplied by the number of units [Defendants] failed to sell" to maintain their exclusive license.

22. In Section 7.1 of the ELA, Defendants committed to "consult and involve [SharkEye] in Licensed Product naming exercises."

23. In Section 7.3 of the ELA, Defendants committed to use the SharkEye trademark "on all packaging (including when repackaged for final retail sale) and web media on www.case-mate.com" on all Licensed Products.

24. In Section 7.3 of the ELA, Defendants committed to manufacture and sell Licensed Products at a level of quality "satisfactory to [SharkEye]."

25. In Section 7.3 of the ELA, Defendants committed to allow SharkEye to inspect Defendants' facilities, or the facilities of its third party vendors, "upon reasonable prior written notice."

26. In August 2011, nearly 60 days after the execution of the ELA, Case-Mate re-launched SharkEye's existing iPhone 4 case to a world-wide audience under the new name "Titan." Even though SharkEye had already launched and began selling iPhone 4 cases under its own trademarked name, Case-Mate insisted on using a different name to attempt to build its own brand using SharkEye's intellectual property.

27. Since SharkEye was already manufacturing and selling a SharkEye case for the iPhone 4 when it was approached by Case-Mate, it agreed to allow Case-Mate to continue using its existing mold to expedite the launch of Case-Mate's first model. Case-Mate had the mold modified to add a button, and did not have product available to sell when it launched "Titan."

28. Shortly thereafter, Defendants decided to change the name of their case based on SharkEye intellectual property to "Tank," creating confusion and nullifying any brand recognition created by the launch of "Titan."

29. Defendants failed to consult with or involve SharkEye regarding either of these names, despite SharkEye's notice to Defendants' of their obligation in Section 7.1 of the ELA to "consult and involve [SharkEye] in Licensed Product naming exercises."

30. In August 2011, Defendants unilaterally changed the material used to manufacture the Licensed Products from acrylonitrile butadiene styrene (ABS) to polycarbonate (PC). This change in materials caused the SharkEye Cases to become brittle and shatter upon impact, resulting in thousands of returns and poor product reviews, which destroyed sales momentum the SharkEye case's reputation right at the most critical point of their entry into the market.

31. In September 2011, SharkEye notified Defendants that its executives would like to visit Defendants' facilities in China in mid-October 2011 to further SharkEye's efforts pursuant to Section 2.1(d) of the ELA to "innovate and improve upon the existing designs." Defendants refused to permit the visit.

32. Beginning in October 2011, it became obvious that Defendants did not have sufficient staff or resources to fulfill the promises Mr. Reddy made in connection with the negotiation and execution of the ELA. In contrast to Mr. Reddy's promises to launch 30 products in 80 countries in 90 days through a massive marketing campaign, Defendants had not launched a single model on their own. They simply painted and repackaged SharkEye's existing iPhone 4 model and launched it under the name "Tank." When SharkEye complained about the lack of progress, Defendants reported it would "take time" to "ramp up the market for Tank."

33. After several additional weeks of failing to provide SharkEye with adequate information or communication to allow SharkEye to fulfill its obligations under the ELA, in November 2011, Defendants notified SharkEye they would no longer provide weekly updates regarding sales activities. SharkEye's inside contact was assigned to other matters and never replaced.

34. In January 2012, the annual International Consumer Electronics Show was held in Las Vegas, Nevada. During the show, the SharkEye cases manufactured from PC without SharkEye's consent failed and shattered in front of several prominent industry product reviewers, further damaging the reputation of the SharkEye Cases.

35. Later that month, SharkEye's CEO met with Defendants to discuss their failure to launch additional models and the massive failures of the iPhone 4 cases made of PC. At the meeting, Defendants failed to provide adequate information or a cohesive strategy for rectifying the situation.

36. In March 2011, SharkEye's CEO and principal investor once against met with Defendants. During the meeting, they expressed their displeasure with Defendants' lack of organization, lack of ownership of projects related to the SharkEye cases, lack of follow up, and failure to launch new models. Mr. Reddy admitted that Case-Mate had experienced major issues and had "realigned."

37. SharkEye also notified Defendants that it had come to their attention that Defendants were manufacturing and selling cases that are directly competitive with and that offer similar protection to the Licensed Products, including without limitation, the "Phantom" case, in breach of Section 3.2(b) of the ELA. SharkEye pointed out to Mr. Reddy that the Phantom case was specifically discussed during the negotiation of the ELA and that SharkEye made it clear that if Case-Mate intended to sell the Phantom and other rugged cases, SharkEye would not execute the ELA. SharkEye reminded Mr. Reddy that during discussions regarding this critical issue, SharkEye was ready to walk away from the negotiating table but Mr. Reddy ultimately agreed that either Case-Mate would not sell the Phantom or would pay SharkEye the same royalty on sales of Phantom and other rugged cases as it agreed to pay on sales of the SharkEye

cases. Mr. Reddy responded by saying that he would "think on it for a day." The meeting was concluded with the request that Defendants commit to the SharkEye cases and launch more models. Mr. Reddy admitted that selling only one model was not a viable marketing plan.

38. In March 2011, because Defendants did not address any of the issues and problems mentioned above, in order to mitigate SharkEye's damages, a proposal pursuant to which SharkEye offered to perform some of Defendants' key responsibilities in return for being reimbursed for its expenses was sent to Defendants. SharkEye also asked Defendants to issue a press release confirming that the previous failures related to the use of PC had been corrected. Defendants failed to do so.

39. In early May 2011, SharkEye's CEO once again contacted Mr. Reddy and complained that Defendants were not adequately responding to SharkEye's requests or providing sufficient information.

40. In mid-June 2011, Mr. Reddy called SharkEye's CEO and claimed that the SharkEye cases were not selling and were too large.

41. During the same call, Mr. Reddy admitted that competitors were selling at least half a million rugged cases every month. Most of these cases, including Defendants' Phantom case, are actually larger than the SharkEye Case. It was decided that an additional call would be held in three days.

42. Instead of calling SharkEye's CEO in three days, Mr. Reddy instructed his general counsel to send a letter repudiating Defendants' obligations under the ELA and stating that it "is not able to go forward with the production and sale of cases" and that it "intends to cease further production of our Tank case" (the "Repudiation Letter").

43. In summary, in contrast to Defendant's promises to launch 30 different models of the SharkEye cases globally in 80 countries in 90 days, over the course of nearly one year, Defendants never launched a single case of their own based on SharkEye intellectual property. The only case Defendants launched was a painted, re-packaged, and re-named version of the iPhone 4 model SharkEye was already selling before being approached by Defendants, which Defendants manufactured using SharkEye's existing mold. Instead of fulfilling their promises and obligations to SharkEye, Defendants launched and put all of their resources behind their own competitive rugged cases, in clear violation of the ELA.

### First Cause of Action:  Breach of Contract

44. SharkEye repeats and re-alleges the allegations in Paragraphs 1 through 43 as though fully set forth herein.

45. Defendants breached their obligations to SharkEye under the ELA as follows: (i) failing to consult or involve SharkEye in naming exercises for the Licensed Products pursuant to Section 7.1 of the ELA; (ii) failing to sell the minimum amount of Licensed Products required under Section 3.2(a) of the ELA and repudiating these obligations in the Repudiation Letter; (iii) marketing and selling the Phantom and other rugged cases in violation of Section 3.2(b) of the ELA; (iv) failing to use the SharkEye trademark on the website www.case-mate.com in violation of Section 7.3 of the ELA; (v) failing to manufacture and sell Licensed Products in accordance with quality standards required under Section 7.3 of the ELA; (vi) failing to allow SharkEye to inspect its facility in China in violation of Section 7.3 of the ELA; (vii) and attempting to terminate, in the Repudiation Letter, the ELA for reasons not authorized in Section 4.3 of the ELA.

46. Further, Defendants' Repudiation Letter constitutes an anticipatory breach of the ELA, and an unqualified repudiation of the entire ELA prior to the time of performance.

47. As a direct result of the foregoing conduct and breaches by Defendants, SharkEye has been damaged, and will continue to be damaged, in an amount not presently known.

## Second Cause of Action: Promissory Estoppel

48. SharkEye repeats and re-alleges the allegations in Paragraphs 1 through 47 as though fully set forth herein.

49. As set forth above, Defendants made certain promises and commitments, including without limitation, that it had the experience and would devote the resources necessary to launch over 30 models in 80 countries within 90 days and design, engineer, manufacture, market, and sell millions of SharkEye cases globally.

50. Defendants knew, or should have reasonably expected that SharkEye would rely on those promises and commitments.

51. In entering into the ELA, SharkEye reasonably relied on Defendants' promises and commitments to its detriment, changing its entire business model to support the efforts of Defendants, its exclusive licensees, and foregoing the valuable right to manufacture or sell the SharkEye cases itself or with other partners.

52. As a direct result, SharkEye has been injured and injustice can only be avoided by enforcing Defendants' promises.

## Third Cause of Action: Fraudulent Inducement

53. SharkEye repeats and re-alleges the allegations in Paragraphs 1 through 52 as though fully set forth herein.

54. Alternatively, SharkEye alleges that it was fraudulently induced into entering into the ELA because Defendants falsely represented to SharkEye that, in exchange for receiving an exclusive license from SharkEye, it would make the SharkEye cases its exclusive line of rugged cases and that it had the experience and would devote the necessary resources to launch over 30 models in 80 countries within 90 days and design, engineer, manufacture, market, and sell millions of SharkEye cases globally.

55. Defendants made these representations with knowledge and with the intention that they would induce SharkEye to enter into the ELA and without the intent to perform or with knowledge that they could not perform.

56. SharkEye justifiably relied on Defendants' representations in entering into the ELA, and as a direct result of Defendants' failure to perform, has been damaged, and will continue to be damaged, in an amount not presently known.

57. Further, Defendants' representations constitute willful misrepresentations of material facts, made to induce SharkEye into acting, and causing SharkEye to be injured.

### Conditions Precedent

58. All conditions precedent have been performed or have occurred.

### Damages

59. As a direct and proximate result of Defendant's conduct, SharkEye suffered the following injuries and damages: (i) actual damages in the amount that remains due under the ELA, calculated in accordance with Section 3.2 and 4.4 of the ELA, in an amount of at least $10,000,000; and (ii) damages traced solely to Defendants' breach of the ELA, including but not limited to damages for SharkEye's reasonable reliance and lost profits in an amount not presently known.

### Attorneys' Fees and Costs

60.     Defendants have acted in bad faith and have cause SharkEye unnecessary trouble and expense, entitling SharkEye to recover its attorneys' fees, costs, and expenses incurred in prosecuting this action pursuant to GA. CODE ANN. § 13-6-11.

### Prayer

61.     SharkEye respectfully requests that the Court enter judgment in its favor and against Defendants and that the Court grant the following relief to SharkEye:

    a.     actual damages in the amount of at least $10,000,000;

    b.     consequential damages, including but not limited to damages for SharkEye's reasonable reliance and lost profits;

    c.     prejudgment and postjudgment interest as allowed by law;

    d.     attorneys' fees, costs, and expenses;

    e.     all other relief the Court deems appropriate.

### Jury Demand

62.     In accordance with FED. R. CIV. P. 38 and 39, SharkEye asserts its rights under the Seventh Amendment of the United States Constitution and demands a trial by jury on all issues.

Dated:  June 27, 2012	Respectfully Submitted,

**OHASHI & HORN LLP**

   */s/ Cody A. Kachel*
Jeff J. Horn Jr.
State Bar No. 24027234
Cody A. Kachel
State Bar No. 24049526
325 N. St. Paul Street, Suite 4400
Dallas, Texas 75201
Telephone: (214) 743-4170
Facsimile: (214) 743-4179
E-mail: horn@ohashiandhorn.com
E-mail: ckachel@ohashiandhorn.com

**ATTORNEYS FOR PLAINTIFF SHARKEYE, LLC**